# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs December 2, 2014

## STATE OF TENNESSEE v. MARQUIZE BERRY

**Appeal from the Criminal Court for Shelby County**
**No. 13-00626     J. Robert Carter, Jr., Judge**

---

**No. W2014-00785-CCA-R3-CD  - Filed March 18, 2015**

---

The defendant, Marquize Berry, appeals his Shelby County Criminal Court jury conviction of attempted second degree murder, claiming that the evidence was insufficient to support his conviction. We affirm but order certain clerical amendments to the judgments.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. ROGER A. PAGE, J., filed a concurring opinion.

Harry E. Sayle III (on appeal), and Lisa Kutch and Jane Sturdivant Tillman (at trial), Assistant District Public Defenders, for the appellant, Marquize Berry.

Herbert H. Slatery III, Attorney General and Reporter; Meredith DeVault, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In February 2013, the Shelby County Criminal Court grand jury charged the defendant with one count each of attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony. The trial court conducted a jury trial in November 2013.

The State's proof at trial showed that on the afternoon of June 15, 2012, Rodney Jamison visited an apartment complex on Kansas Street in Memphis, where he stood outside and observed a dice game between the defendant, known as "Fat Daddy," and another man named Marco, who used the moniker, "Stink." Mr. Jamison had known the defendant since the two men were children.

During the course of the game of dice, Mr. Jamison came to believe that the defendant was cheating. Mr. Jamison expressed his belief to "Stink" and encouraged him to walk away from the game. A heated argument ensued between Mr. Jamison and the defendant, and a small crowd began to gather. The defendant threatened to retrieve "a strap," which is slang for a handgun. Mr. Jamison questioned why a handgun was necessary and lifted his shirt to show the defendant that he was unarmed. Mr. Jamison suggested that they fight instead, but the defendant declined. The defendant again stated that he was going to get "a strap," and the defendant walked away, disappearing behind the apartments. Mr. Jamison stayed where he was, believing the argument to be over.

A few minutes later, the defendant reappeared and confronted Mr. Jamison about their earlier disagreement. Mr. Jamison became concerned and ran toward a nearby car, turning back in time to see the defendant holding a black handgun. The defendant chased Mr. Jamison around the car, and Mr. Jamison attempted to run across the street. According to Mr. Jamison, the defendant fired three shots, striking Mr. Jamison in the lower back with the second shot. The defendant attempted to continue firing at Mr. Jamison, but the weapon would no longer fire, and the defendant fled the scene.

Mr. Jamison entered a small grocery store across the street from the apartments and collapsed. He was taken to the hospital and underwent surgery to repair the damage caused by the bullet. Mr. Jamison later spoke with Memphis Police Department ("MPD") officers and informed them that "Fat Daddy" had shot him. On June 25, Mr. Jamison viewed a photographic lineup and positively identified the defendant as his shooter.

Courtney Edwards, who was familiar with both Mr. Jamison and the defendant, was also visiting the apartments on Kansas Street on June 15 and observed the argument between the defendant and Mr. Jamison. Mr. Edwards saw the defendant leave the scene briefly and then return, and Mr. Edwards saw the defendant shoot Mr. Jamison. Mr. Edwards immediately left the scene, but he returned a few minutes later and informed MPD officers that he had witnessed the shooting. Mr. Edwards explained to the officers that he did not feel comfortable speaking with them in front of the crowd of people that had gathered at the grocery store. Officers then transported Mr. Edwards to the police station where he gave a signed statement and positively identified a photograph of the defendant as depicting the man who had shot Mr. Jamison.

MPD Officer Martrell Boswell responded to the call of the shooting on Kansas Street on June 15. Mr. Edwards informed Officer Boswell that the shooter was known as "Fat Daddy" and that the shooter's grandmother resided in the apartment complex where the shooting had occurred. Officer Boswell proceeded to the grandmother's residence, where he learned that the true identity of the shooter was Marquize Berry.

Norman Towaf, who was acting manager of the grocery story across the street from the apartments, testified that he was taking care of the store while his cousin, the owner, was on vacation out of the country. Mr. Towaf did not witness the shooting, but he allowed MPD officers to view the store's video surveillance footage. One of the store's video cameras captured the shooting. According to Officer Boswell, the video showed a group of men gathered across the street from the store. Shortly thereafter, Officer Boswell "saw a male black coming out of an abandoned apartment beginning to shoot at one of the male blacks and he ran off camera and the other guy ran off camera." MPD Sergeant Eric Kelly also viewed the surveillance footage and described a similar scene, testifying that one male left the gathered group and entered one of the apartments. A few moments later, a man dressed in all black approached the group and "there appear[ed] to be a commotion." Sergeant Kelly described the victim's ducking behind a vehicle to avoid the gunman and then running toward the grocery store as the man in black gave chase. Both Officer Boswell and Sergeant Kelly described seeing muzzle flashes or "puffs of smoke" emanating from the gun the man in black was holding, but neither officer could discern any faces on the video. Because both Mr. Towaf and Sergeant Kelly were unfamiliar with the video surveillance system, the video was not preserved and was later deleted.

Less than two weeks after the shooting, Mr. Jamison encountered the defendant at a local shopping mall. According to Mr. Jamison, the defendant approached him, admitted having shot him, and threatened to do it again. The defendant even instructed Mr. Jamison to "meet [him] on Kansas [Street]" where the shooting had taken place.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon*[1] colloquy, the defendant elected not to testify but did choose to present proof. MPD Officer Dustin Kennedy testified that he spoke with both Mr. Jamison and Mr. Edwards after the shooting and that neither man provided a description of the shooter, only identifying him as "Fat Daddy." MPD Sergeant Lorenzo Young testified that he, too, spoke with both Mr. Jamison and Mr. Edwards and that he had taken a statement from Mr. Edwards.

Based on this evidence, the jury convicted the defendant of the lesser included offense of attempted second degree murder. In addition, the jury convicted the defendant as charged of both aggravated assault and employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court merged the aggravated assault verdict with the attempted second degree murder conviction and sentenced the

---

[1] *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999).

defendant as a standard offender to a term of 10 years' incarceration.[2]  In addition, the trial court imposed a sentence of six years' incarceration for the conviction of employing a firearm during the commission of a dangerous felony,[3] to be served consecutively to the 10-year sentence, for a total effective sentence of 16 years' incarceration.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal.  In this appeal, the defendant contends only that the evidence was insufficient to support his conviction of attempted second degree murder.  We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]"  *Id.* § 39-12-101(a)(2).  "Second degree murder is . . . [a] knowing killing of another."  T.C.A. § 39-13-210.

In the instant case, the proof at trial established that Mr. Jamison and the

---

[2]The trial court ordered a sentence of 6 years' incarceration for the aggravated assault conviction.

[3]Tennessee Code Annotated section 39-17-1324 lists "[a]ttempt to commit second degree murder, as defined in §§ 39-13-210 and 39-12-101" as one of the qualifying dangerous felonies for the offense of employing a firearm during the commission of a dangerous felony.

defendant had known each other since they were children. On June 15, 2012, Mr. Jamison accused the defendant of cheating in a game of dice, and a heated argument ensued between the two men during which the defendant twice threatened to retrieve a "strap" or handgun even though Mr. Jamison made it clear he was unarmed. The defendant disappeared for a short period of time and then returned, briefly confronting Mr. Jamison before producing a handgun. Mr. Jamison ran, and the defendant gave chase, firing the handgun at Mr. Jamison at least three times and striking Mr. Jamison once in the lower back. The handgun then jammed or misfired, and the defendant fled. Mr. Edwards, who had known both Mr. Jamison and the defendant for some time, witnessed these events and positively identified the defendant as the man who shot Mr. Jamison. Although the video surveillance footage from the grocery store was not preserved for trial, both Officer Boswell and Sergeant Kelly viewed the video at the store and saw a man leave the group of men gathered across the street, then saw a man approach the group a few moments later, and, after a brief commotion, saw that same man chasing another man and firing a gun at him. Although neither Mr. Jamison nor Mr. Edwards used the defendant's actual name, MPD officers were able to find the defendant by his nickname, "Fat Daddy," and the information provided by Mr. Edwards that the defendant's grandmother resided in the Kansas Street apartments. Two weeks after the shooting, the defendant approached Mr. Jamison at a shopping mall, admitted to having shot him, and threatened to do so again.

Viewing this evidence in the light most favorable to the prosecution, we hold the evidence adduced at trial overwhelmingly supports the defendant's conviction of attempted second degree murder. Although not raised by the defendant on appeal, we hold the evidence likewise supports the defendant's convictions of aggravated assault and employing a firearm during the commission of a dangerous felony.

We detect, however, errors that require correction in the judgments. First, because the defendant's conviction of aggravated assault in count two must merge with his conviction for attempted second degree murder in count one, no judgment form was needed for count two. *State v. Addison*, 973 S.W.3d 260, 267 (Tenn. Crim. App. 1997). We therefore vacate the judgment in count two and order the amendment of the judgment in count one to reflect, in the special conditions portion of the judgment, that the guilty verdict the jury returned in count two for aggravated assault is merged into count one.

Second, based on the transcript of the sentencing hearing and the judgment forms, it is clear that the defendant was considered a standard, Range I offender. In the judgment for employing a firearm, however, the trial court, in the release eligibility section, checked the box for "Violent 100%" but checked "Standard" in the section for offender status. Tennessee Code Annotated section 39-17-1324(h)(1) provides that a violation of subsection (b) "is a Class C felony, punishable by a mandatory minimum six-year sentence

to the department of correction." Tennessee Code Annotated section 40-35-501(i)(2) provides a list of the specific felonies to which the "Violent 100%" designation is applicable, and employing a firearm during the commission of a dangerous felony is not one of those specifically listed felonies. Given the trial court's ruling at the sentencing hearing that "the employing a firearm" conviction must be served "at 100 percent," as well as the fact that the trial court properly indicated the six-year sentence on the portion of the judgment form expressing the mandatory minimum sentence length for the employment of a firearm, the judgment usefully reflects that the sentence is to be served at 100 percent by force of Code section 39-17-1324(h)(1) without inaccurately stating that the offense is a violent offense with a 100 percent release eligibility. However, because the defendant is a standard offender, the judgment must be corrected to delete the "violent 100%" designation.

Accordingly, on remand, the trial court shall enter an amended judgment removing the designation for release eligibility of "Violent 100%". In all other respects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE